IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MOLLY ANNE YANICH, | ) | CASE NO. 1:18-CV-1633 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Molly Anne Yanich ("Yanich") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 11.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Yanich filed her application for SSI in July 2013, alleging a disability onset date of January 1, 2013. Tr. 34, 332. She alleged disability based on the following: memory problems, hypoplastic left heart syndrome, migraine headaches, "ADD," learning disability, anxiety/depressed mood disorder, asthma, and hypothyroidism. Tr. 362. After denials by the state agency initially (Tr. 195) and on reconsideration (Tr. 209), Yanich requested an administrative hearing (Tr. 174). A hearing was held before an Administrative Law Judge ("ALJ") and, on August 31, 2015, the ALJ determined that Yanich was not disabled. Tr. 213-220. Yanich appealed, and the Appeals Council remanded her case back to the ALJ based, in

part, on new and material evidence Yanich submitted. Tr. 226-228. Upon remand, the ALJ held a second hearing. Tr. 55-106. On June 7, 2017, the ALJ issued a second decision and determined that there are jobs that exist in significant numbers in the national economy that Yanich can perform, i.e. she is not disabled. Tr. 31-48. Yanich requested review of the ALJ's decision by the Appeals Council (Tr. 277) and, on May 25, 2018, the Appeals Council denied review, making the ALJ's June 7, 2017, decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Yanich was born in 1994 and was 18 years old on her alleged onset date. Tr. 47. Her vocational history is described in detail below.

### B. Relevant Evidence[1]

Yanich was born with Hypoplastic Left Heart Syndrome (HLHS), which means that the left ventricle of her heart did not function. She required three corrective surgeries by the time she was four years old, including open heart surgery at birth. Tr. 530, 703. It is believed that her HLHS caused her to have cognitive and behavior disorders. E.g., Tr. 136, 530, 703.

2010: In January 2010, Yanich and her mother visited the Child and Family Counseling Center of Westlake for family counseling with psychiatrist Dr. Hussein. Tr. 611, 509. Yanich was being treated for attention deficit hyperactivity disorder ("ADHD") due to her mother's and her school teacher's reports of inattention, forgetfulness, and disorganization. Tr. 611. Her grades had declined. Tr. 611. Her anxiety was under control. Tr. 611. She was diagnosed with

---

[1] Yanich only challenges the ALJ's decision with respect to her mental impairments. Thus, only the medical evidence related to these impairments is summarized and discussed herein. This section includes medical evidence, education records, and vocational assessments.

anxiety disorder and ADHD and prescribed medication.  Tr. 611.

In February, Dr. Hussein changed Yanich's ADHD medication and in March, her teachers had noticed improved attentiveness.  Tr. 613, 615.  Her anxiety was mild and she had no depression.  Tr. 613.

Yanich and her mother continued to see Dr. Hussein regularly and medication adjustments were made as needed.  E.g., Tr. 614, 616, 618, 652-653.  In October she was paying better attention at school.  Tr. 628.  Upon exam, Dr. Hussein noted that she "smiles spontaneously" and had an appropriate affect.  Tr. 628.  She was medication compliant and had no side effects.  Tr. 628.  No medication changes were made.  Tr. 628.

2011: In January 2011, it was reported that some inattentiveness persisted but Yanich was not as anxious.  Tr. 654.  She was medication compliant and had no side effects.  Tr. 654.  Her medication dosage was increased.  Tr. 654.

In February 2011, when Yanich was in eleventh grade, she had cognitive testing using the Wechsler Abbreviated Scale of Intelligence ("WASI"), which resulted in a full scale IQ of 81, in the low average range.  Tr. 441.  School psychologist K. Suhadolnik, M.A. noted a previous score of 95 in 2002 and concluded that the 2011 score was possibly "a low estimate of [Yanich's] cognitive ability."  Tr. 441-442.  Academic achievement testing showed basic reading skills in the low average range; average skills in reading comprehension, reading fluency, and written expression; and mathematics skills "significantly below the average range."  Tr. 462-463.  Yanich struggled with regular education content and required comprehension checks throughout the class period.  Tr. 462.  She did not show initiative, seek help when needed, exhibit interest in subject/vocational areas, or work at appropriate speed.  Tr. 453.  She had middling stamina.  Tr. 453.  She did arrive on time, attend regularly, complete her work on time, communicate and

cooperate with others appropriately, follow directions and classroom rules, stay on task, show respect for the rights and property of others, and accept responsibility for her own behavior. Tr. 453. She continued to need special accommodations: tests were read to her; she had double time to take tests; she was given preferential seating away from distractions and near instructors; and she was given "modified tests (reduced multiple choice options)." T. 454.

On February 28, Yanich and her mother saw Dr. Hussein. Yanich had improved focus and organizational skills and was medication compliant with no side effects. Tr. 629.

In May, Dr. Hussein assessed Yanich as baseline with no complaints. Tr. 630. In November, it was reported to Dr. Hussein that some teachers said Yanich was not paying enough attention in school; Dr. Hussein increased her ADHD medication. Tr. 622. Upon exam, she had a constricted affect. Tr. 622.

2012: In January 2012, Yanich's mother came alone to the visit with Dr. Hussein and reported that Yanich was not participating in classroom discussions and was hyperactive and distracted at home. Tr. 623. Dr. Hussein added a medication. Tr. 623. The next month, Yanich had improved focus and had started getting better grades. Tr. 624. She was medication compliant, had no side effects, and Dr. Hussein stated that her affect was "smiles." Tr. 624.

In an April visit with Dr. Hussein, Yanich was "focusing well with minimal anxiety" and denied any depression or medication side effects. Tr. 625. She had a "full-range" affect. Tr. 625. In August, Dr. Hussein assessed her anxiety and ADHD to be "at baseline." Tr. 626.

In December 2012, when Yanich was in twelfth grade, her Individualized Education Program ("IEP") identified her as qualifying for continued special education services due to ADHD, anxiety disorder, and dysthymic disorder. Tr. 462. She was also enrolled in a one-year administrative assistant program at Polaris Career Center ("Polaris") secondary to her interest in

pursuing a receptionist/secretarial position. Tr. 464. Her teachers at Polaris indicated that Yanich has a hard time following directions. Tr. 462. When given an assignment, she just sat there because she did not understand what she was supposed to do. Tr. 462. Per her IEP, she participated in "a combination of resource room, general education, and inclusion settings for all high school academic requirements due to her need for additional support in mathematics and her weak attention and memory skills." Tr. 462. She continued to have various modifications and accommodations: tests were read to her, double time for test taking, preferential seating away from distractions and close to the instructor, verbal cues for on task behavior, modified tests with a reduction in objective choices, and modified curriculum to ability level. Tr. 463. The IEP also stipulated that, despite not having passed the math and science portions of the Ohio Graduation Test, Yanich would be "excused from the consequences of not passing" these portions. Tr. 468-471.

2013: In January 2013, Yanich's mother saw Dr. Hussein and reported that the family had decided to take Yanich off her ADHD medication about two weeks prior because she was "too intense" on it. Tr. 627, 567. Now, Yanich did not want to go to school partly due to anxiety. Tr. 627. Dr. Hussein switched her medication to the antidepressant Zoloft. Tr. 627. The next month, Yanich was happier, less anxious, and more talkative. Tr. 601. Notes from her teachers reflected a positive change in her mood and no problems with inattention. Tr. 601. She had no academic issues. Tr. 601. Upon exam, she was alert and oriented, with "affect smiles more." Tr. 601.

In February, Yanich saw neurocardiologist Neil Friedman, MBCHB, for a follow up for

her headaches.[2]  Tr. 567.  Upon exam, she was friendly and cooperative, "but still tends to be quiet and reserved."  Tr. 568.  Her "mental status [was] normal and age appropriate, with clear and coherent speech[,]" although she tended to avoid eye contact.  Tr. 568.

In April, Yanich and her mother saw Dr. Hussein.  Yanich was still having some anxiety symptoms.  Tr. 602.  Her Zoloft dosage was increased.  Tr. 602.  Dr. Hussein recommended Yanich have "neuro psych" testing, noting that Yanich's last testing was done six years ago.  Tr. 602.

On May 2, 2013, Yanich saw Jennifer Haut, Ph.D., at the Cleveland Clinic for a neuropsychological evaluation.  Tr. 509.[3]  At the time, Yanich was in 12th grade and participated in vocational education at Polaris to become an administrative assistant.  Tr. 510.  She received special education services pursuant to an Individualized Education Program ("IEP") and received a variety of modifications and accommodations.  Tr. 510.  She had received a failing grade at Polaris for her third quarter.  Tr. 510.  Yanich stated that the course was too difficult for her; her teachers reported that she was capable of success but lacked motivation.  Tr. 510.  Yanich's mother stated that Yanich had significant difficulty understanding directions and remembering the required steps to complete a task and that she often became stuck in class because she did not know what steps to take next.  Tr. 510.  She did not complete her assignments at school.  Tr. 509.  Her mother reported that Yanich lacked flexibility, had difficulty expressing her feelings, and could be stubborn, which impacted her social interactions.  Tr. 510.

Dr. Haut administered the Wechsler Intelligence Scale test with the following results: full

---

[2]  MBCHB is a Bachelor of Medicine and Bachelor of Surgery degree, awarded in the United Kingdom and other countries.  It is considered equivalent to an MD.  See e.g., https://www.cpsbc.ca/physician_search/credentials (last visited June 6, 2019).

[3]  The treatment note from the May 2 evaluation is found at Tr. 509-514.  Dr. Haut's subsequent report is found at Tr. 537-542.  Much of the information in these two records are duplicative.

scale IQ of 82 (12th percentile, low average range); verbal comprehension index of 96 (39th percentile, average range); perceptual reasoning index of 75 (5th percentile, borderline range); working memory index of 83 (13th percentile, low average range); and processing speed index of 86 (18th percentile, low average range). Tr. 511. She was given the Wechsler Memory Scale test, which showed an auditory memory index of 70 (2nd percentile) and a visual memory index of 61 (<1st percentile); her nonverbal memory was in the 2nd percentile, her immediate memory index was in the <1st percentile; and her delayed memory index was in the 1st percentile. Tr. 512. Dr. Haut wrote that Yanich demonstrated "intact (average)" performance on a measure of sustained attention, obtained while on her customary medication. Tr. 511, 513. Dr. Haut summarized that Yanich's memory testing showed moderately low overall auditory verbal memory and extremely low overall nonverbal memory. Tr. 512. Dr. Haut observed that, throughout the testing, Yanich was polite, calm, made good eye contact, and had fluent, normal speech. Tr. 510, 512.

In conclusion, Dr. Haut wrote that Yanich's "performance on measures of auditory attention and working memory was generally average to low average and consistent with her intellectual capabilities." Tr. 513. Yanich was "able to encode and retain new information under some circumstances but supports are necessary." Tr. 514. Her longstanding pattern of stronger verbal compared with nonverbal abilities and her particular academic difficulties in math suggested relatively greater right hemisphere dysfunction, not uncommon in children with medical issues such as congenital heart disease that impacts or potentially impacts neurocognitive development. Tr. 513. Dr. Haut opined that Yanich may appear unmotivated as a result of not being certain of what was required of her due to memory issues. T. 514. She would benefit from the following accommodations or supports: more repetition of new material;

a monitored pace; shorter learning intervals interspersed with longer breaks; and strategies for adapting to learning new materials (e.g., recognition cues, stories rather than lists). Tr. 514. She "strongly recommended" counseling/psychotherapy; however, due to Yanich's resistance to this treatment, she may be more responsive to intervention from a rehabilitation team. Tr. 514.

In June 2013, Yanich's mother went alone to the appointment with Dr. Hussein and reported that Yanich has been calmer and less agitated. Tr. 603. She was at home resting; she had been staying up most nights and waking up late. Tr. 603. She had an upcoming training for an appropriate job placement. Tr. 603.

On September 3, Yanich's mother called Dr. Hussein to say that Yanich's motivation was low, she mostly wanted to stay at home, and her mother asked to taper the Zoloft dosage. Tr. 603. Dr. Hussein agreed and her Zoloft dosage was decreased. Tr. 603. Two weeks later, Yanich reported that her primary care physician had increased the dosage on her hypothyroid medications, which caused her tiredness. Tr. 604. She denied depression. Tr. 604. Her mood was anxious, her affect "smile," her thoughts clear and coherent, and her insight and judgment fair. Tr. 604.

On September 30, Yanich returned to Dr. Friedman; her exam findings were the same as her prior visit, except that her eye contact had improved. Tr. 574.

In October, after she had completed high school, Yanich was placed at a daycare center for ten days of work training and job coaching.[4] Tr. 545-546, 745. According to Dr. Schaerfl's report, Yanich did not get offered a position after her training period and she recited the daycare center's exit evaluation of Yanich: Yanich "performed well enough on many indices" including

---

[4] Not all the records from the vocational assessments are in the record. As described more fully below, Dr. Schaerfl summarized Yanich's vocational records in her report and, when appropriate, the Court cites to Dr. Schaerfl's report to summarize Yanich's vocational experiences.

attendance, appearance, accepting direction, quality of work for some tasks and playing well with children. Tr. 747. Performance standards were not met for: following directions well enough; showing self-direction (only 25% of the time); working quickly enough; showing initiative when not occupied; asking how she can help others; and being assertive. Tr. 747. The job coach observed that she needed more experience, noting she was "too shy and timid to show the leadership needed" for the job. Tr. 747.

On November 13, Yanich and her mother saw Dr. Hussein. Yanich was "more awake and alert" on lowered medication dosages, was not depressed, and was "managing her anxiety well." Tr. 605. Upon exam, she was alert, had a euthymic mood, and intact concentration. Tr. 605.

On November 20, state agency reviewing psychologist Karla Voyten, Ph.D., opined that Yanich could understand and remember simple instructions, complete simple, routine tasks in a work setting in which she was not required to work at a fast pace or meet high production quotas, and adapt to a few routine changes in the work setting. Tr. 191-192.

2014: In January 2014, Yanich had a second vocational placement at the same daycare center working with a different job coach. Tr. 748. According to Dr. Schaerfl's report, the job coach observed improvement during the two-week session and concluded that Yanich was "capable of doing the work if she was given time to build her confidence" but recommended counseling to build her confidence and assertiveness. Tr. 755. She accepted direction quickly, understood and followed direction, displayed a "very good" work ethic, and had no problem with frustration tolerance. Tr. 753-754. On the other hand, she worked independently only 60 percent of the time, lacked the ability to be assertive, and she hesitated to take on a task unless told. Tr. 754-755. Her quiet manner was more effective when working with the younger

children but a detriment when working with the older children. Tr. 754. The daycare center did not offer her a job at the end of her placement. Tr. 755.

On February 3, 2014, Yanich and her mother saw Dr. Hussein; there were no significant symptoms reported, Yanich was medication compliant, and she denied any side effects. Tr. 656. Upon exam, she was well engaged, had a euthymic mood, a full range affect, coherent thoughts, and an intact memory. Tr. 656. Dr. Hussein assessed her as baseline and recommended she slowly taper off Zoloft. Tr. 656.

On February 26, state agency reviewing psychologist Tonnie Hoyle, Psy.D., affirmed Dr. Voyten's opinion. Tr. 205-206.

In March, Yanich returned to Dr. Friedman. Her exam findings were the same as her prior visit; her eye contact continued to improve. Tr. 689.

In April, it was reported to Dr. Hussein that Yanich was tolerating the decreased Zoloft dose well and had no anxiety or depression. Tr. 634. Dr. Hussein advised she continue to taper off, then discontinue, her Zoloft. Tr. 634.

In June 2014, Yanich had a vocational placement at a different daycare center working with a teacher for one month. Tr. 416-418, 755. She received a "satisfactory" rating in 28 of 30 itemized skills, including: performs acceptable amount of work, has the ability to analyze problems/reach acceptable solutions, shows flexibility and adaptability, and works at a consistent pace. Tr. 417. She received a "needs improvement" rating in "asks for clarification" and "follows procedures for calling off work," due to the fact that her mother had called in for her the one day she was absent. Tr. 417. The teacher assessed her as ready for "Individual Placement (independent/competitive work in non-supervised setting)" and recommended she continue to gain experience working with children. Tr. 418. She had shown much improvement in working

with children since the beginning of the assessment and was taught many different tasks (changing a diaper, feeding, nap time). The teacher recommended she continue to gain experience working with children, by either possibly volunteering at a child care center or babysitting before obtaining a job at a child care center. Tr. 418. Alternatively, Yanich could obtain a job in an environment where children frequented, such as a toy store or children's themed restaurant, to gain work experience and more experience working with children. Tr. 418.

2015: In January 2015, Yanich had a fourth vocational placement, working at a bank operations center to gain clerical and secretarial skills. Tr. 413, 757. Twenty-five days into the placement, she had "caught on quickly" to all but one of the jobs she experienced and was able to complete 6 of 7 jobs with little or no assistance. Tr. 414. She improved each day. Tr. 414. She completed her one-step mailing tasks at a rate at or below other workers. Tr. 414. She had no difficulty learning the tasks assigned to her, but she found the work boring. Tr. 414, 415. She had no enthusiasm for her work and wanted to do the tasks she liked but not the ones she did not like. Tr. 415. She needed improvement in most areas of motivation and work attitude. Tr. 413. She had decreased interest in working during the final weeks of her placement and she was not offered a job. Tr. 415, 761.

Over the course of several days in October through December 2015, Yanich underwent an assessment with clinical psychologist Caroline Schaerfl, Ph.D. Dr. Schaerfl interviewed Yanich and her parents; reviewed medical, educational, and vocational records; and administered various assessments, including: the Woodcock-Johnson IV Tests of Cognitive Abilities ("WJ-IV"); selected mathematics subtests from the Wechsler Individual Achievement Test, Third Edition ("WIAT-III"); and an assessment for core ADHD symptoms known as the "Qb Test." Tr. 701. Dr. Schaerfl issued her 99-page report on January 16, 2016. Tr. 701-799.

Dr. Schaerfl recited facts about children born with HLHS: they are at a greater risk for behavioral issues, learning disabilities, depression, anxiety, and ADHD; they have an increased problem maintaining enough oxygen to the brain, which, in turn, can lead to learning related issues; and "more recent evidence gathered over the lifespan of children born with HLHS suggests that these individuals often show underdeveloped 'theory of mind' capabilities that are core incapacities similar to and/or associated with Autism Spectrum Disorder." Tr. 703. According to her parents, by the second grade, Yanich became increasingly resistant to going to school and had daily tantrums and battles. Tr. 714. By tenth grade, her parents reported that she had a pattern of shutting down when frustrated. Tr. 732.

On the WJ-IV, Yanich scored in the "limited" range for the majority of test areas, such as general intellectual ability, short-term memory, and fluid reasoning; in the "very limited" range in two areas (cognitive processing speed and quantitative reasoning); and in the "limited to average" range in visual processing. Tr. 768. Dr. Schaerfl stated that Yanich's scores "fall within the severity levels indicative of Intellectual Disability." Tr. 790. Her WIAT-III math scores placed Yanich at the 6th and 10th percentiles in math problem solving and numerical operations, respectively, and "showed an overall significant mathematical weakness, well below average, and below expectation for someone who finished high school." Tr. 769. She observed that Yanich "struggled to complete basic math operations" and "could not divide any numbers using any format." Tr. 770. Her Qb Test results were "technically inconclusive" because she made so many "commission errors (i.e., hitting the button for incorrect stimuli)." Tr. 786. Dr. Schaerfl consulted a Qb Test expert for interpretation assistance and concluded that Yanich "most likely...may not have been able to keep the instructions clear in her own mind because of her limited working memory process." Tr. 786. She opined that anxiety also could have

contributed to her performance. Tr. 786. She remarked that Yanich "was not taking any medications for ADHD and has not taken such medications for some time." Tr. 785.

Dr. Schaerfl diagnosed Intellectual Disability, Moderate Severity/Intellectual Developmental Disorder; Autism Spectrum Disorder; ADHD; and Generalized Anxiety Disorder. Tr. 794-798. She concluded that Yanich had "pervasive" cognitive, social, psychological, and medical impairments with "functional impairments" that were "significant and do not project a capacity for her to fully live or work independently." Tr. 793. She would likely have work attendance problems due to many doctor appointments and a "proneness to illnesses" and she lacked "sufficient capacity to maintain motivation to independently sustain quality of work performance for tasks." Tr. 793.

Regarding Yanich's potential for independent functioning, Dr. Schaerfl wrote that Yanich's history revealed that she was never independent in her work at school and was never gainfully employed. Tr. 792. Jobs that she attempted never advanced past a temporary training period, even with a job coach and/or other person providing direct oversight, training and supervision. Tr. 792. She was never hired after a trial job because she did not meet the minimum requirements. Tr. 792. The supervision and direction she received on the job was considerable and continuous and unlikely to be found for any length of time in most entry level jobs. Tr. 792-793. She had never shown the capacity to fully learn and independently execute all of the tasks necessary to the entry level jobs she attempted within a common job training time period. Tr. 793.

Dr. Schaerfl commented that Yanich had tried medications for ADHD and anxiety but that these were stopped due to adverse side effects. Tr. 790. She did not show the capacity to take her medications reliably and independently. Tr. 790. Her parents had taken her to

counseling several times over the years, but she was generally uncooperative and at times overtly defiant. T. 791. Her friends were mostly at school and she had a disinclination for social interaction when outside school. Tr. 737.

### C. Testimonial Evidence

#### 1. Yanich's Testimony

Yanich was represented by counsel and testified at the administrative hearing. Tr. 57. She is single and lives in a house with her parents and brother. Tr. 63. She does not have a driver's license; she gets around by others driving her, usually her parents or older sister. Tr. 64. She had a job for two weeks at a day care but was fired; she didn't do everything correctly and was not involved with the kids as much as she should have been. Tr. 65.

When asked what prevents her from working, Yanich answered that she has a memory problem. Tr. 65. She has a hard time remembering what to do at a job. Tr.65. They give her instructions but she always forgets what they are. Tr. 65. Also, she has to be comfortable with the people with whom she works, so sometimes she would get very nervous. Tr. 65. She is not very social; she has one friend that she hangs out with a few times a year. Tr. 68. She is also friendly with her friend's sister and another person who lives close to her friend. Tr. 69. She sees them infrequently because her friend got busy after they graduated from high school and Yanich started feeling nervous to go out in public. Tr. 70. She usually talks to them every day on Facebook or by texting and sometimes on the phone. Tr. 69. They talk about whatever comes up in their lives, or movies or television shows. Tr. 69.

Yanich spends her days watching television and movies. Tr. 70. She watches series on Netflix and she is current watching a few. Tr. 71. She has no problems tracking the plot. Tr. 71. She reads books; it takes her a few weeks to read a 200-page book. Tr. 71. Sometimes she has

problems following the plot if it is a confusing story. Tr. 71. She is on Facebook every day; she posts things and follows what her friends are doing or news, whatever is on there. Tr. 72. She logs on and off a few times a day. Tr. 72. She does not go to the store with her family and she is really bad making change; she is able to count dollars. Tr. 72. Currently, her parents give her money to buy stuff. They put money in her bank account, but she does not know what her balance is or how to access it. Tr. 73-74. She is not responsible for doing chores at home. Tr. 79. She also spends time writing stories about historical things. Tr. 80. She does research on the internet or uses professional books and she also makes stuff up. Tr. 80. A book she is writing is about 100 pages long. Tr. 80. Sometimes her parents or brother read what she writes. Tr. 80. Typically, she writes for about an hour a day whenever she thinks of something. Tr. 81.

Yanich takes medication for her thyroid and her migraines. Tr. 66. Every day she has to be reminded to take her medication. Tr. 68. She has no side effects from her medications. Tr. 74. She is not participating in therapy or counseling; when asked why not, Yanich responded, "I don't know." Tr. 74. The last time she saw anyone akin to a psychologist was when she was in high school. Tr. 75.

Regarding her vocational assessment, Yanich confirmed that, of her four assessments, there was discussion about her being hired on at one of them, the bank. Tr. 76-77. However, she declined an offer of work; "It wasn't exactly the kind of work I wanted to do." Tr. 77. She was interested in working at the daycare, but they did not offer her employment because they said she needed more training. Tr. 77-78. She had difficulty performing the job at the daycare. Tr. 77. She didn't always remember what to do around the kids, so she had to have a job coach explain it to her. Tr. 77. She was able to follow most of their instructions, although sometimes she would forget. Tr. 77. She would have to be reminded the next day or taught how to do it again, but

eventually she would learn how to do it.  Tr. 78.

Yanich again reiterated that she has memory problems and social anxiety.  Tr. 79.  She is not taking any medication for her social anxiety.  Tr. 79.  When asked why not, if her anxiety is preventing her from working or interfering with her daily living, Yanich answered that she is not sure.  Tr. 79.  "I never went to the doctor for that, I guess."  Tr. 79.  When asked why not, Yanich did not know.  Tr. 79.

## 2. Yanich's Mother's Testimony

Yanich's mother also testified at the administrative hearing.  Tr. 82.  She testified that "they" have been worried about how well Yanich could take care of herself as she gets older and whether she could live an independent life.  Tr. 82.  She was born with a severe heart problem that causes physical problems that can get worse with age.  Tr. 83.  Her lack of oxygen in utero has affected her intellectually so her IQ is lower than normal.  Tr. 83.  She has trouble paying attention, her memory is very bad, she gets confused easily, she can't change tasks easily, and all these things make it hard for her to do anything really well.  Tr. 83.  She also has emotional problems, anxiety, and she doesn't like to go anywhere.  Tr. 83.  She is not good at explaining herself or understanding herself.  Tr. 83.  She feels like she can't do anything well, she feels she is going to fail, and she doesn't want to try.  Tr. 93.  If she does try, and struggles, she gives up easily.  Tr. 83.  Also, Yanich has some anger issues; as her mother understands it, these issues stem partially from low IQ and some autism she was diagnosed with.  Tr. 83.  It makes it hard because she'll get angry easily and fight with "us" about everything.  Tr. 83.  Finally, Yanich's mother thinks that, due to "the whole autism and so forth," Yanich tends to focus on certain things.  Tr. 83.  She has fish; she likes to look at fish, talk about the fish.  Tr. 83.  She likes royalty and spends a lot of time talking about kings and queens.  Tr. 83.  She has been obsessed

about certain things. Tr. 83. When asked about Yanich's writing, Yanich's mother stated that Yanich writes stories about royalty or sometimes mystery stories involving teenagers. Tr. 84.

Yanich is not responsible for any chores or household responsibilities because "all these years she's fought us about everything and we got tired." Tr. 84. "And so I charge her money and I do the chores, but I charge her money from money she gets for her birthday or whatever, so she pays me to do those things." Tr. 84. She and her husband put money in Yanich's account and they tell her they expect that when she gets a job she will pay for things like her cell phone and internet use. Tr. 84-85.

Yanich is not currently participating in any therapy or getting treatment for her anxiety or mental health concerns. Tr. 85. Throughout her life they took her to so many therapists and tried many medications, but it didn't really help. Tr. 85. The medications didn't seem to do anything and Yanich doesn't like to talk about herself or have a lot of insight, so the therapy didn't go anywhere. Tr. 85. And Yanich doesn't want to go. Tr. 85. Yanich's mother would like her to go and try medication again but, at this point, Yanich doesn't want to and it didn't help before. Tr. 85. She has not taken any medication or participated in counseling since becoming an adult. Tr. 85. The ALJ referenced the recommendation by Dr. Schaerfl—that Yanich have an additional evaluation by an agency or program that can provide case management and identify other supports within the community so that a plan can be made or put in place for Yanich's training such that it may be possible for Yanich to live a semi independent life in a setting with some oversight and that she would benefit from participation in a training program finding assisted employment—and asked if any of these things were done after Dr. Schaerfl's report in February 2016 (about 15 months prior to the hearing). Tr. 85-86. Yanich's mother answered that they had not been done. Tr. 86. She explained that they were waiting

because they had applied to the county board of developmental disabilities. Tr. 86. It took two years for the board to approve Yanich and they had to meet with different people and fill out new forms. Tr. 86. About four weeks ago they had a meeting with United Cerebral Palsy and they are supposed to start looking for a job assessment for Yanich but they have not heard back yet. Tr. 86. It is harder to find something like this due to the lack of funding for it. Tr. 86.

When asked to describe the problems she experienced getting Yanich to go to a therapist or counselor, Yanich's mother stated, "Well, she didn't really want to go[.]" Tr. 87. It was "kind of like school that I would drag her there basically." Tr. 88. When asked if she physically dragged her, Yanich's mother stated yes. When asked if she had to put her down the stairs or in the car, she stated sometimes. "Sometimes it was more like yelling, or you can't be on the—you can't get a reward if you don't go. Usually it's the computer or the cell phone is what gets her to go to things." Tr. 88. When asked if she thinks that Yanich could have gotten to her assessments on her own, Yanich's mother answered no. Tr. 88. She stated, "She doesn't see a need for that." Tr. 88. She doesn't want to go, doesn't feel she's capable of learning to drive or take a bus to go places, and she doesn't like to go anywhere. Tr. 89. Yanich's mother was asked what the difference was between when Yanich doesn't want to go somewhere versus the disinclination many people have to not go somewhere, yet still go. Tr. 89. Yanich's mother stated that part of it is that Yanich "doesn't like to go anywhere, which most people like." Tr. 89. However, Yanich does like to go out to dinner. Tr. 89. Otherwise, she does not like to go places or understand a need to go places. Tr. 89. If they tell her that she is depressed or anxious and that it might help to talk to somebody, Yanich would say "no, I won't. I don't need that. It won't help." Tr. 89. When they tell her she has to take her medication or she could die, she says that she doesn't need it. Tr. 89. She thinks the doctors just want her money. Tr. 89. Her

reasoning is so different that she has no desire to do things, like get a job or go to school.  Tr. 89.

Unless Yanich's family was there to make her get somewhere, arriving on time would be a

problem.  Tr. 89.  They got her up in the morning and drove her to her "assessments."  Tr. 89.

She has an alarm clock but she doesn't want to use it.  Tr. 90.  Once, when she was working, she

was told to come back later to fill in for someone; she did not tell the person that she would not

be back and she did not go back.  Tr. 90.

Yanich's mother stated that Yanich has one friend and that the last time Yanich saw her

was over a year ago.  Tr. 90.  They communicate on Facebook.  Tr. 90.  Using Facebook is the

way she wants to communicate with people.  Tr. 90.  When she was growing up and was a little

more social, others would get frustrated because Yanich would not call them and they would

have to badger her.  Tr. 91.  Her friend also has disabilities and also doesn't want to get together;

they are both happier staying home.  Tr. 91.

When asked to summarize what the people involved with Yanich's vocational assessment

would tell her about Yanich's performance, Yanich's mother explained that the people at

Yanich's first two assessments—the day care—didn't think she was ready to work there.  Tr. 92.

She cooperated and tried, but she only liked working with a certain age group, she didn't ask for

help much, and she wasn't into disciplining.  Tr. 92.  Next, Yanich had a daycare job where she

first got a week of training from a person who was trained to work with people with disabilities.

Tr. 92.  She did alright in that limited environment: a small group of children and someone who

could be with her all the time.  Tr. 92.  Then, she had a job "that was actually a regular job" for

two weeks but she got fired.  Tr. 92.  She couldn't do a regular job where she didn't have

somebody helping her all the time.  Tr. 92.  She had another vocational assessment at a bank

doing clerical work and she thinks it was the same there; they needed to be with her to show her

how to do things and to keep checking to make sure she did it.  Tr. 93.  She wouldn't ask for help if she didn't know how to do something.  Tr. 93.  If it wasn't something she really wanted to do she would get slower.  Tr. 93.  It was hard for her to change tasks.  Tr. 93.  Basically, she needed supervision most of the time.  Tr. 93.

Her vocational assessments were similar to what happened in high school: she had close supervision and accommodations.  Tr. 93-94.  She was in a "resource room" where she got help; she would sit towards the front of the room; she had more time for tests.  Tr. 94.  She would not do her homework and it was a fight.  Tr. 94.  They had to perform elaborate scenarios with her to get her to do her homework, such as playing school, but she would forget things soon after doing them, like flash cards.  When she was younger, Yanich got Bs and Cs, and when she was in high school she got more Cs and Ds.  Tr. 94.  She failed a class and almost failed her administrative assistant class.  Tr. 94.  She took the Ohio Graduation tests and, after several tries, she was able to pass a couple of the tests, but not all of them.  Tr. 94-95.

Yanich's mother stated that, until Dr. Schaerfl performed testing on Yanich, they did not always realize how low Yanich's intellectual ability was.  Tr. 95.  They didn't realize she had autism and knowing that helped explain why she has been so difficult over the years and why she doesn't seem to think like "we do."  Tr. 95.  These are things that will never change.  Tr. 95. These disabilities are common with kids with the heart problem she had; their executive functioning tends to get worse.  Tr. 95.  Yanich will need a lot of help as she grows older and they are worried about how she can support herself.  Tr. 95.  Since she graduated from high school about five years ago, Yanich's impairment has gotten a little bit worse.  Tr. 95.  Dr. Schaerfl's report described Yanich very well; they have tried many things like therapy and

medication, jobs and school, and she hasn't been hired "and so nothing so far has helped, or has convinced us that she can do this on her own."  Tr. 96.

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 96-105.  The ALJ asked the VE to determine whether a hypothetical individual of Yanich's age and education could perform work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could perform the following jobs that exist in significant numbers in the national economy: packager, office cleaner, and clerical assistant.  Tr. 97-98.

## III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his June 7, 2017, decision, the ALJ made the following findings:

1.   The claimant has not engaged in substantial gainful activity since July 11, 2013, the application date. Tr. 34.

2.   The claimant has the following severe impairments: hypoplastic left heart syndrome; hypothyroidism; migraine headaches; asthma; attention deficit hyperactivity disorder; depression; anxiety, and a learning disorder. Tr. 34.

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 35.

---

[5] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can perform occasional climbing of ramps and stairs. She can never climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. She can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. She can have frequent exposure to humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat. The claimant can lift or carry 20 pounds occasionally and ten pounds frequently. In an eight-hour workday, she can sit for six hours, stand for six hours, and walk for six hours. She can push and pull as much as she can lift and carry. The claimant is limited to performing simple, routine, and repetitive tasks, but not at a production rate pace, i.e., assembly line work. She is limited to simple, work-related decisions in using her judgment and dealing with changes in the work setting. The claimant is limited to frequent interaction with supervisors, coworkers, and the public. Tr. 38.

5. The claimant has no past relevant work. Tr. 47.

6. The claimant was born in 1994 and was 19 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 47.

7. The claimant has at least a high school education and is able to communicate in English. Tr. 47.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work. Tr. 47.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 47.

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 11, 2013, the date the application was filed. Tr. 48.

### V. Plaintiff's Arguments

Yanich challenges the ALJ's decision on three grounds: (1) the ALJ's RFC assessment is not supported by substantial evidence because the ALJ failed to include accommodations to work and a lower production rate; (2) the ALJ failed to consider whether Yanich's non-compliance with treatment was due to her medical disorders; and (3) new and material evidence requires a remand. Doc. 16-1, pp. 19-26.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

### A. The ALJ's RFC is supported by substantial evidence

Yanich argues that the ALJ's RFC is not supported by substantial evidence. She asserts that the ALJ failed to include accommodations in Yanich's RFC as required by SSR 11-2p and failed to include a limitation that Yanich cannot sustain competitive work due to her low production rate as required by SSR 96-8p. Doc. 12, pp. 3, 16-21.

#### 1. Accommodations

Yanich asserts that she has required accommodations "in every grade throughout her education" and in all her vocational training and assessment programs. Doc. 12, p. 19. She contends that the ALJ failed to specifically address her need for accommodations, as required by SSR 11-2p. Doc. 12, p. 19.

SSR 11-2p states,

*Extra Help and Accommodations*

Working requires a person to be able to do the tasks of a job independently, appropriately, effectively, and on a sustained basis....If an adult with an impairment(s) needs or would need greater supervision or assistance, or some other type of accommodation, because of the impairment(s) than an employee who does not have an impairment, the adult has a work-related limitation.

We consider how independently a young adult is able to function, including whether the young adult needs help from other people or special equipment, devices, or medications to perform day-to-day activities. If a young adult can function only if he or she receives more help than would generally be provided to people without medical impairments, we consider how well the young adult would function without the extra help. The more extra help or support of any kind that a young adult receives because of his or her impairment(s), the less independent he or she is in functioning, and the more severe we will find the limitation to be.

***

    1. *Accommodations*
....The fact that a young adult receives or has received accommodations as a part of his or her IEP or Section 504 plan, may be an indication that he or she has a work-related limitation.

2011 WL 4055665, at *7-8.

The ALJ considered Yanich's status as a young adult and her need for special education services and accommodations. Tr. 41 (citing SSR 11-2p). Thus, Yanich's assertion that the ALJ "did not comply with the mandates of SSR 11-2p and did not specifically address or evaluate her need for special accommodations" is incorrect. Doc. 12, p. 19. The fact that the ALJ did not provide for accommodations in his RFC assessment does not mean that he did not consider them. In his decision, the ALJ cited Yanich's conservative mental health treatment with Dr. Hussein. Tr. 41. He detailed Yanich's intelligence testing, school accommodations, and her vocational training. Tr. 41-43. He discussed the evaluations by Drs. Haut and Schaerfl. Tr. 42-43. He explained that he discounted Dr. Schaerfl's assessed limitations (Tr. 44-45), a finding that Yanich does not challenge. The ALJ explained that Yanich received conservative treatment and did not make use of recommended, existing treatment. Tr. 46. Additionally, the ALJ observed,

> Significantly, there are multiple indications that at least some of the claimant's difficulties related to motivation factors. Both the claimant's mother and teachers expressed concern about her lack of motivation (Exhibit 3F/10). In a Function Report, the claimant herself stated that she could probably do most household chores, but did not want to learn them (Exhibit 4E/4). Vocational training records from one job placement indicate that the claimant had no difficulty learning most of the tasks assigned to her, but further stated that she showed no enthusiasm for her work (Exhibit 12E/4).

Tr. 46. The ALJ also noted that Yanich had quit a prior volunteer position she had for two days while in twelfth grade because she was "bored." Tr. 41. The ALJ summed up the evidence supporting his RFC assessment: the opinions of the two state agency reviewing physicians, which he gave "great" weight to; the lack of consistent mental health treatment; the fact that some of Yanich's difficulties were due to motivational factors; and Yanich's functional abilities as demonstrated in the four areas of mental functioning. Tr. 46-47. The ALJ did not find Yanich required an accommodation; therefore, the omission of an accommodation in his RFC assessment is not error.

In her reply brief, Yanich contends that the ALJ erred because he "offered no reasons or discussion why special accommodations were not included in the RFC." Doc. 16, p. 3. The Court disagrees; as set forth above, the ALJ offered reasons and discussed why special accommodations were not included in the RFC. Yanich complains that the ALJ did not address the kind and extent of support she received in school. Doc. 16, pp. 5-6. But the ALJ did address the support Yanich received in school. Tr. 41 (ALJ noting that Yanich's IEP included a resource room, general education, and inclusion settings for all high school academic requirements due to her need for additional support in mathematics, her weak attention, and her memory skills); Tr. 42 (ALJ discussing Dr. Haut's evaluation referencing "a number of accommodations [as school], including small group instruction and an inclusion classroom for social studies and science."). Yanich submits that the ALJ did not list all the accommodations she had in school, such as extra

time, "her continuous need for special assistance; or even the modified and lowered performance expectations." Doc. 16, p. 6. The ALJ's failure to list every accommodation separately does not mean the ALJ did not consider them. *See Kornecky v. Comm'r of Soc. Sec*., 167 Fed. App'x 496, 507-508 (6th Cir. 2006) (an ALJ is not required to discuss every piece of evidence in the record).

Yanich asserts that the ALJ failed to take into consideration the fact that her satisfactory performances during her vocational placements occurred "within the context of a job coach who was with her every step of the way." Doc. 16, p. 7 (citing Tr. 746, Dr. Schaerfl's report discussing Yanich's first vocational placement at the day care center). The ALJ was well aware that Yanich participated in "vocational services and job coaching" and his recitation of the record is consistent with Yanich's vocational assessment. Tr. 41-42. Finally, Yanich criticizes the ALJ's accurate comment that Yanich's was able to learn tasks assigned to her during the course of her job training, stating, "Dr. Haut addressed [Yanich's] ability to learn or improve." Doc. 16, p. 9. But Yanich was assessed by Dr. Haut in May 2013, prior to any vocational placement. It was proper for the ALJ to rely on Yanich's vocational assessments, not Dr. Haut's report, when discussing Yanich's vocational performance.

## 2. Competitive work activity

Yanich alleges that the ALJ's RFC limitation to work "not at a production rate pace, i.e., assembly line work" was "grossly inadequate." Doc. 12, p. 21. She argues that this limitation does not adequately describe her inability to meet "the minimum requirements of all aspects of competitive work." Doc. 12, p. 21. In support of her argument, Yanich cites to her vocational assessments at the daycare and the bank operations center. However, she does not challenge the ALJ's findings detailed in his decision, i.e., she does not show that the ALJ's decision is not supported by substantial evidence. The Court also notes that Yanich's ultimate issue with her

work at the bank was not due to her inability to keep up, but her lack of motivation to perform work she did not like. Tr. 42, 415.

In sum, the ALJ's RFC assessment is supported by substantial evidence.

**B. The ALJ did not err when considering Yanich's failure to comply with treatment**

Yanich argues that the ALJ erred because he did not consider that her impairments are the reason that she is not compliant with treatment, as set forth in SSR 16-3p. Doc. 12, p. 21; Doc. 16, p. 10. The relevant portion of SSR 16-3p Yanich references provides,

> ...if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.... When we consider the individual's treatment history, we may consider (but are not limited to) one or more of the following:
>
> ***
>
> Due to various limitations (such as language or mental limitations), an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment.
>
> Due to a mental impairment (for example, individuals with mental impairments that affect judgment, reality testing, or orientation), an individual may not be aware that he or she has a disorder that requires treatment.

2017 WL 5180304, at *9-10; Doc. 12, pp. 21-22.

Yanich asserts that her refusal to take medication, go to the doctor, "or do what she did not want to do," was part of her mental disorders. Doc. 12, p. 22. In support, she cites testimony from her mother and Dr. Schaerfl's recitation of Yanich's history in her report, much of which was told to Dr. Schaerfl by Yanich's parents. Doc. 12, p. 22. However, the ALJ gave "little" and "some" weight, respectively, to the statements of Yanich's mother and Dr. Schaerfl's report

(Tr. 44-46), findings which Yanich does not challenge. Moreover, "statements about [] pain or other symptoms will not alone establish that [a claimant is] disabled." 20 C.F.R. § 416.929 ("There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.").

Finally, Yanich does not identify what mental disorder caused her to be non-compliant with treatment. The ALJ found that, generally, Yanich was unmotivated and did only what she wanted to do. Yanich has not tied this behavior to a diagnosed mental impairment. She "offer[s]" that her resistance, low frustration tolerance, giving up easily, and refusal to do things are "all manifestations of her multiple mental and cognitive disorders including her Autism Spectrum Disorder." Doc. 12, p. 22. However, the ALJ did not credit the autism diagnosis assessed by Dr. Schaerfl. Tr. 45 ("Dr. Schaerfl is the only medical source to suggest a history of autism disorder, a diagnosis that was not endorsed by treating medical providers."). Yanich does not challenge the ALJ's finding regarding her autism diagnosis.

The ALJ did not violate the provisions in SSR 16-3p.

**C. A Sentence Six remand is not warranted**

Yanich submits that, following the ALJ's decision, she was evaluated again for work "by United Cerebral Palsy of Greater Cleveland, Oakleaf and Opportunities for Ohioans with Disabilities. It was determined that her disability was too significant and her case was closed." Doc. 12, p. 23.

Pursuant to a Sentence Six remand, a district court may remand a case for further administrative proceedings in light of new evidence presented, if a claimant shows that the evidence is new, material, and that there was good cause for not presenting it in the prior proceeding. *Foster v. Halter*, 279 F.3d at 357 (6th Cir. 2001) (citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996)); 42 U.S.C. § 405(g).

Here, Yanich cannot show that she has new and material evidence for the simple reason that she does not provide any such evidence for the Court to consider. She states that she was placed working in a drug store with a job coach and purportedly quotes a portion of an undated assessment. Doc. 12, p. 24. The Court cannot tell if this evidence is new because Yanich does not provide the date of this assessment. Moreover, the findings she recites are consistent with her other vocational assessments; to wit, she was capable of performing the tasks but was not motivated to do so. The assessment purportedly found that she "was very capable of completing the stocking, but stated she really did not like the job....[she] is able to complete tasks and understood the work, however, she did not show a lot of motivation to do so, if [she] was in an environment she enjoyed, it is possible her motivation would increase." Doc. 12, p. 24. This assessment would not have altered the ALJ's decision because it is consistent with Yanich's prior assessments and bolsters the ALJ's decision. *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) ("Material evidence is evidence that would likely change the Commissioner's decision.").

Yanich also cites the conclusion of an assessment purportedly provided by "Oakleaf" in December 2017, which finds that Yanich was ready to do work in a community setting with staff supervision/instruction to teach needed work skills and behavior. Doc. 12, p. 24. She does not provide this assessment, the findings underlying the assessment, or any context for the

assessment.  In short, she has not shown that she has new, material evidence.  Therefore, she is not entitled to a sentence six remand.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.


IT IS SO ORDERED.



Dated: June 6, 2019

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge